JOHN FARNUM & others *vs.* DAVID BOUTELLE, Administrator.

When a debtor, who has mortgaged personal property to secure a debt, dies insolvent, the mortgagee cannot prove his debt in full, before commissioners appointed to examine the claims against the deceased's estate, unless he first waives his mortgage; but if he applies the amount of the mortgaged property towards the discharge of his claim, and a balance is left unpaid, he may prove such balance before the commissioners.

A mortgaged to F. certain machinery owned by A. & B. in common, to secure payment of $2500: F. assigned the mortgage to F. & Co., and B. sold his interest in the machinery to F. & Co.: A. used the machinery, until his death, in manufacturing cotton goods, which he sent to F. & Co., to be sold by them on commission, and on which they made advances to him: When A. first sent goods to F. & Co. for sale, they charged said $2500 to him, in the account kept by them with him, and when they forwarded the account, they wrote to him that they should consider the mortgage in force, as collateral security: This charge was never withdrawn from F. & Co.'s account with A., though they rendered accounts current semiannually till his death, and the credits given to him amounted, in the aggregate, to $74,000; the balance of each account, however, being against him: After his death, his estate was represented to be insolvent, and his administrator sold, at auction, "all the right, title and interest A. had in the machinery" aforesaid, to P., one of the firm of F. & Co., who stated, at the auction, that he had a valid mortgage thereon, upon which nothing had been paid: F. & Co. afterwards presented their claim for said $2500, for proof and allowance, to the commissioners appointed to examine claims against A.'s estate, and contended that said mortgage was discharged, by being charged in account as aforesaid. *Held,* that the mortgage was in full force; that P. purchased only an equity of redemption; and that the claim for said $2500 could not be legally proved against A.'s estate.

A. ordered goods to be packed and forwarded to F. & Co., commission merchants, to whom he owed a balance, on account, and wrote a letter of advice, enclosing an invoice, but died before the letter was mailed or the goods had left his premises, and his son, on the day after his death, forwarded the letter and the goods, and F. & Co. sold them, and gave credit for the proceeds, in reduction of their balance against A., whose estate was insolvent. *Held,* that F. & Co. had no lien on these goods, for the balance of their account against A., and that they must pay over the said proceeds to A.'s administrator.

THIS was an appeal, taken by David Boutelle, administrator of the estate of Percy Atherton, deceased, from the decision of commissioners appointed to examine the claims of creditors

against said estate, which was duly represented to be insolvent. The trial was before *Hubbard,* J. who made the following report thereof:

The amount of the plaintiffs' claim was admitted by the administrator, subject to the objections hereinafter stated.

It was proved on the trial, that in the year 1832, certain machinery of the value of $10,500 was bought by said Atherton and William Buffum, and the bill of sale taken in the name of Atherton, but agreed to be the joint property of the two. By consent of Buffum, and for the mutual benefit of him and Atherton, the machinery was immediately mortgaged to John Farnum, one of the plaintiffs, for $2500, he having advanced that sum in part payment of the purchase money. In 1839, said Buffum sold all his interest in the machinery to said John Farnum. Before that time, viz. in 1835, said Farnum assigned the said mortgage to the plaintiffs, who are commission merchants in Philadelphia. At the time of this assignment of the mortgage, the said Buffum and Atherton were using the machinery, in the name of Atherton, in the manufacture of cotton goods at Fitchburg, and so continued till Buffum sold his interest in it, as aforesaid ; and afterwards Atherton continued to carry on said business till his death. The goods manufactured were sold by the plaintiffs, who, from time to time, made advances thereon, keeping an account current with the manufacturers, under the name of " the Stone Mill."

Soon after the transfer of said mortgage to the plaintiffs, the amount due thereon was charged to " the Stone Mill," in the account kept by the plaintiffs with that concern, and was never withdrawn from that account. Accounts current were rendered half yearly, by the plaintiffs, to the manufacturers, during all the subsequent years.

Between the time of the charge of the amount of the mortgage to " the Stone Mill," and the time of the sale to Farnum of Buffum's interest in the machinery, there were credits to " the Stone Mill," the aggregate amount of which was $74,000 ; but the balance, on the rendering of each account, was in favor of the plaintiffs.

On the 9th of January 1844, the defendant, as administrator of the estate of Atherton, sold at auction " all the right, title and interest Percy Atherton had in the machinery in the Stone Mill, and lease of the mill," which machinery was that in question. Peter Farnum, one of the plaintiffs, was present at the sale, and on being called upon by the defendant to state his claims, he then said he had a good and valid mortgage on the machinery, given in 1833, and that nothing had been paid on it. The defendant (the administrator) then said that he should sell, subject to whatever incumbrance was on it, and that the purchaser must take his risk. It was bid off by said Peter Farnum, at $3500, being the fair value of one half of the machinery, and somewhat more than the sum at which it was appraised.

It was shown in evidence, that twenty nine bales of cotton goods, which were sold by the plaintiffs, and for the proceeds of which the sum of $1752·81 was credited in their account, were put into a wagon, by direction of Atherton, the day before his death, to be forwarded to the plaintiffs, and that an invoice of them was made; but that the goods had not left Atherton's premises at the time of his death, but were forwarded to the plaintiffs, by Atherton's son, the day after his death.

The defendant contended that he was entitled to receive the proceeds of said goods; and it was agreed by the parties. that if such should be the opinion · of the court, the above sum should be added to the plaintiffs' claim against said' Atherton's estate. It was further agreed by the parties, that: upon the facts above stated, judgment should be rendered for the plaintiffs for such sum as, in the opinion of the court, may be due, and that, on such judgment, the plaintiffs should have such dividend as should be decreed for the creditors of said' Atherton.

*C. Allen & N. Wood,* for the plaintiffs.
*Barton & Bacon,* for the defendant.

It was agreed at the argument, that when the plaintiffs forwarded the first account, in which the $2500 were charged to
14 *

the " Stone Mill," they wrote to Atherton, that they should consider the mortgage in force as collateral security.

SHAW, C. J. The facts in this case are somewhat complicated, but when analyzed and understood, we think it will not be difficult to ascertain the rights of the parties. It appears that John Farnum & Co. are commission merchants in Philadelphia, of which firm Peter Farnum was a partner; that the deceased, Percy Atherton, was a manufacturer at Fitchburg, in this county. Atherton and David Buffum, for their joint account, purchased the machinery of a factory, and Atherton mortgaged his undivided half to John Farnum, to secure his note to Farnum or order, for $2500. Atherton carried on the business of manufacturing at a place called the Stone Mill, and consigned his manufactured goods to the plaintiffs at Philadelphia, as factors, for sale, and the plaintiffs advanced large sums to Atherton ; and this continued to the death of Atherton. About the time this account was opened, John Farnum indorsed the note for $2500, and assigned the mortgage, given to secure it, to John Farnum & Co. who charged the note in their account current, but at the same time gave Atherton notice, that they still considered the mortgage in force as collateral security.

Now, it is contended by the plaintiffs, that as this note was charged as an item in an extensive account current, and the amount, many times over, afterwards credited, the earliest credits, by the rules of appropriation, must be applied to the payment of the earliest debits, and so the note must be deemed absolutely paid, and the mortgage discharged, although there was constantly a large cash balance due, on such account, from Atherton to the plaintiffs. But these conventional rules respecting the appropriation of payments are adopted only in the absence of proof of the agreements or acts of the parties regulating such application of payments. It is always at the election of a party indebted to another on more than one account, on paying money, to elect on which account the payment shall be applied ; and this election being notified to the creditor, if he accept the payment, it shall be

deemed a payment on the account to which the debtor has directed it to be applied. *Reed* v. *Boardman,* 20 Pick. 441. So here, Atherton, having received notice from John Farnum & Co. that they still considered the mortgage in force, might, on consigning goods to them, have directed the proceeds to be applied specifically to the payment of the debt thus secured by mortgage ; and if they had accepted the consigned goods, sold them, and received money for the proceeds, to the amount of that note, it must have been deemed *de facto* payment, and the mortgage discharged. This, however, never was done ; the goods were consigned on general account, and the plaintiffs were always in advance to Atherton.

Such was the state of things when Atherton died ; and on his estate being represented insolvent, the defendant, as his administrator, brought his estate and effects to a sale at auction, at which Peter Farnum, one of the partners in the firm of John Farnum & Co. attended ; the firm, as it appears in this case, being large creditors. The state of the factory and machinery was this : John Farnum & Co. had purchased one undivided half of the machinery of Buffum, the original co-purchaser with Atherton. Atherton had obtained a lease of the premises where the business was carried on, and had an unexpired term therein. The interest, which the administrator proposed to sell, was an undivided half of the machinery, with the unexpired term in the mill, and the advantages incident thereto.

A question then arose, whether the machinery, thus to be sold, still remained subject to the incumbrance of said mortgage. Peter Farnum, being called upon, said he had a good and valid mortgage on the machinery, and that nothing had been paid upon it. The administrator then said he should sell, subject to whatever incumbrance was on it, and that the purchaser must take his risk. Peter Farnum became the purchaser at $3500. Now, whether any other purchaser might have successfully contested that mortgage with John Farnum & Co. for whose account it was purchased, or not, we think that *they* could not. After the declaration of Peter Farnum.

that the mortgage was in force, he must be taken to bid for the equity of redemption, and to take it, if the highest bidder, as an equity of redemption; that is, the sum to be given after deducting the $2500 for which it stood mortgaged.   It has substantially the same effect as if enough of the machinery had been taken out to pay the $2500, and then bids were made for the residue.   Such a declaration on the part of the holder of the mortgage would have a natural tendency to deter other buyers, and therefore he, and those for whom he acts, must be estopped from afterwards insisting that the mortgage was paid and discharged, by credits in account, especially credits given for proceeds of goods, on which new advances were constantly made.   The court are therefore of opinion, that the $2500, thus deemed paid by the mortgaged goods, must be stricken out of the general account. The specific question is, whether the sum of $2500, part of the plaintiffs' demand against the estate of the deceased insolvent, should be allowed ; and this depends on the question, whether that debt has been paid, and the mortgage discharged, by its being introduced into the general account of the firm. For, if the mortgage remained in force at the time of the decease of the debtor, then it is very clear, as well upon principle as authority, that the creditors cannot prove their debt, without first waiving their mortgage, or, in some mode, applying the amount thereof to the reduction of the debt, and then proving only for the balance.   *Amory* v. *Francis*, 16 Mass. 308.   But in the present case, it is apparent from the evidence, that one half of the machinery upon which the mortgage, if in force, was a lien, exceeded the sum of $2500, and therefore if the plaintiffs retained the mortgage, no part of the $2500 can be proved.   Being of opinion, for the reasons stated, that the mortgage did remain in force, and was so declared by one of the partners, when the mortgaged property was offered for sale, they are bound by it, and therefore cannot prove that $2500.

In regard to the other question raised on the report, the court are of opinion, that the plaintiffs are bound to account

ᵗo the administrator for the $1752·81, in cash, and have
no right to credit them, in their general account with the in-
testate, in reduction of their claim.   A factor has undoubtedly
a lien upon all goods of his principal, consigned to him for
sale, and in his actual or constructive possession, for his gen-
eral balance.   But before such lien attaches, the goods must
have been delivered or sent to the consignee, or, at least, put
upon their transit to him ; and an intention so to consign them,
and an intimation of such intention by letter, whilst they
remain in the actual possession and custody of the consignor,
is not sufficient to create a lien.   In the present case, it ap-
pears that the goods remained on the premises of the intestate
at the time of his decease, and  were subsequently forwarded
by his son.   But by whomsoever they were forwarded, it
must have been without authority.   It could not be by
authority of the intestate, because all authority conferred by
him ceased with his death ; nor by the administrator, for he
was not then appointed.   But when the administrator was ap-
pointed, the property vested in him, by relation, from the de-
cease of the intestate.  Com. Dig. Administration, B. 10.  *Long*
v. *Hebb*, Style, 341.  *Wonson* v. *Sayward*, 13 Pick. 404.

The goods, when forwarded, were the property of the ad-
ministrator ; the consignees' lien for their general balance
against the intestate did not attach to them ; and therefore the
consignees must account for them to the administrator for the
full amount, and their claim against the estate will be in-
creased accordingly by withdrawing that credit.